| Minute Order Form (06/97) | | | |
|---|---|---|---|
| **United States District Court, Northern District of Illinois** | | | |
| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
| **CASE NUMBER** | 02 C 6630 | **DATE** | 10/22/2003 |
| **CASE TITLE** | Bouso vs. Elkay Manufacturing Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [13-1] is granted. Judgment entered in favor of the defendant. All future dates, including trial date of 1/26/04 are stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | OCT 2 3 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | 24 |
| ✓ | Mail AO 450 form. Mailed by MD. | U.S. DISTRICT COURT CLERK  03 OCT 22 PM 4:55 | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/22/2003 date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMER BOUSO, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ELKAY MANUFACTURING CO., )<br>)<br>Defendant. )<br>) | No. 02 C 6630<br>Judge Joan H. Lefkow |

**DOCKETED**
OCT 2 3 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Amer Bouso ("Bouso"), has filed this action against defendant, Elkay Manufacturing Co. ("Elkay"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e) *et seq.* ("Title VII"), 42 U.S.C. § 1981 and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). In his Complaint, Bouso alleges that he was discriminated against based on his national origin (Kurdish), religion (Muslim) and disability. He also alleges that he was retaliated against for complaining about this discriminatory treatment. Before the court is Elkay's motion for summary judgment. For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Bouso is Muslim and his national origin is Kurdish. (Def. L.R. 56.1 ¶¶ 4-5.) He was employed at Elkay's Broadview, Illinois plant from November 1998 until his termination on February 28, 2002. (Def. L.R. 56.1 ¶¶ 2, 49.) The Broadview plant, which manufactures sink bowls, is divided into two sides: the standard side and the custom side. (Def. L.R. 56.1 ¶ 11.) The standard side manufactures standard stock sink bowls while the custom side manufactures large custom sink bowls. (Def. L.R. 56.1 ¶ 11.) Initially Bouso's duties were to supervise employees in the manufacturing of stainless steel sinks on the custom side by making sure the production schedule was met, solving employees' problems and handling day-to-day issues. (Def L.R. 56.1 ¶ 12.) In July or August 2000, at the request of the plant manager, Bouso transferred to

2

the position of manufacturing coordinator on the standard side. (Def. L.R. 56.1 ¶ 14.) In this position, he reported to Steve Kozel ("Kozel"). (Def. L.R. 56.1 ¶ 15.)

**Bouso's Allegations of Discriminatory Treatment**

Initially, Bouso complains that when he was hired, Elkay did not post his picture on its intranet system. (Def. L.R. 56.1 ¶ 80.) According to Bouso, when new employees are hired at Elkay, their picture was always posted welcoming them to the company. (*Id.*) When his picture was not posted, Bouso approached the Human Resources Department, who told him they would take care of it. (*Id.*) Bouso believes that it was discriminatory to not post his name on the intranet. (Def. L.R. 56.1 ¶ 81.)

Bouso also complains of a number of statements and incidents involving Kozel. In September 2000, Bouso was in Kozel's office discussing a schedule. (Def. L.R. 56.1 ¶ 82.) When Kozel disliked what Bouso proposed, Kozel told him that "I don't know how you think. You can't be thinking like human being or like regular folks, regular people." (Def. L.R. 56.1 ¶ 83.) When Bouso asked him what he meant, Kozel replied "Your kind, you know, your kind" and turned around and said "Camel jock." (Def. L.R. 56.1 ¶ 84.) Bouso responded by saying "Okay, have a good day" and walked out. (Def. L.R. 56.1 ¶ 85.)

On May 23, 2001, Bouso went into Kozel's office to talk about some employee matters when Kozel asked him about the Hajj. (Def. L.R. 56.1 ¶ 87.) Bouso told him that Muslims go there every year to thank God. (Def. L.R. 56.1 ¶ 88.) Kozel laughed and responded, "Well that is a good place for a bad crowd to be in . . . . This is how bad crowd gather together. Get to know each other." (*Id.*) Bouso did not say anything because Kozel was "short-fused" and it was better to just walk out. (Def. L.R. 56.1 ¶ 89.)

3

On May 25, 2001, Kozel sent Bouso and another employee, Terry Porter, an e-mail asking Porter if certain spreadsheets existed and if so, to forward them to Bouso and, if not, to let Bouso know. (Def. L.R. 56.1 ¶ 91.) Thereafter, on May 28, Kozel asked Bouso what happened with the matter. (Def. L.R. 56.1 ¶ 92.) When Bouso told Kozel that Porter never did get back to him, Kozel responded that he should not have depended on a sick guy like Bouso who forgets everything and that Bouso should stay home until he is healthy. (*Id.*) Also during this conversation, Kozel asked Bouso why he did not eat ham. (Def. L.R. 56.1 ¶ 93.) Bouso responded that Muslims, like Jews, do not eat ham. (*Id.*) Kozel then stated, "Well these guys are fools. They don't know what they are missing." (*Id.*)

On June 28, 2001, when Kozel disliked a suggestion Bouso made concerning the running of some schedules, Kozel banged on his desk and shouted at Bouso "that people like you do not know how to plan things, how to get things under control" and that Bouso "could not manage the department" and that it was his problem to complete the task. (Def. L.R. 56.1 ¶ 96.) Also, in the first week of July 2001 after a morning meeting, Kozel told Bouso not to get involved with his problems, that he wanted nothing to do with Bouso, that Bouso should talk to someone else about his problems, to stop sending him e-mails and that Kozel just wanted to be kept out of the loop. (Def. L.R. 56.1 ¶ 99.) Nevertheless, Bouso e-mailed Kozel regarding a few matters Kozel was supposed to look into and decide on, but Bouso saw that Kozel deleted the e-mails before looking at them. (Def. L.R. 56.1 ¶ 100.) Moreover, on August 30 and October 4, 2001, Kozel sent congratulatory e-mails to a number of people, but not to Bouso. (Def. L.R. 56.1 ¶ 104.)

On September 29, 2001, Kozel wanted Bouso to perform some training, so Bouso met with another employee, Everette Motley, the quality control manager, who complained that

4

Bouso and Kozel's division was not up to standard. (Def. L.R. 56.1 ¶ 105.) When Motley told Bouso that he was going to go to the plant manager to solve the problem with the division, Bouso went to talk to Kozel. (Def. L.R. 56.1 ¶ 106.) Bouso recounted their conversation as follows,

> I told [Kozel], you know, Everette is not happy, and he is going to talk to Mark Whittington [the plant manager, hereinafter referred to as "Whittington"] or talk to you, the issues. And he says, that is because you are not competent. That is your problem. You are the guy who we picked to do the training and you are not doing, you know, you are not doing what you are supposed to do. I am telling you you are not competent of doing your job.

(*Id.*)

Regarding all of the above incidents, Bouso complained only to Kozel and to no one else at Elkay.[1] (Def. L.R. 56.1 ¶¶ 86, 90, 94, 98; Pl. Resp. to Def. L.R. 56.1 ¶¶ 86, 90, 94, 98; Bouso dep. at 181.) It is these complaints to Kozel that Bouso bases his retaliation claim on. (Def. L.R. 56.1 ¶ 108.) Bouso stated that he "wouldn't dare" complain to anyone at Elkay that he felt harassed based on his national origin, and he could not recall ever complaining to anyone that he was being harassed because of his religion or disability. (Def. L.R. 56.1 ¶ 109.)

**Bouso's Stroke**

In September 2000, due to a heart valve problem, Bouso underwent aortic valve replacement. (Def. L.R. 56.1 ¶ 19.) During this procedure he suffered a stroke, which left him experiencing weakness and difficulty speaking for at least some period of time. (Def. L.R. 56.1 ¶ 20.) Bouso did not return to work following the surgery until February 2001. (Def. L.R. 56.1 ¶ 22.) After his return to work, Bouso claimed that he was physically impaired because he had

---

[1] In May or June 2001, Bouso did ask Whittington if he could be transferred back to the second shift. (Def. L.R. 56.1 ¶ 34.) When Whittington asked him why, Bouso responded that he did not like working for Kozel because Kozel was putting too much pressure on him, and because of his health. Bouso stated that the second shift "would be less pressure on me physically . . . with my heart issue and my stroke issue." (Def. L.R. 56.1 ¶ 35.) Within a few weeks Bouso was transferred back to the second shift. (Def. L.R. 56.1 ¶ 37.)

weakness on his right side, his left side felt cold, he struggled to talk, and when he became tired, he had trouble remembering. (Def. L.R. 56.1 ¶ 28.) He did, however, testify that at the time he returned to work full time he could brush his teeth, bathe, comb his hair, and get dressed, although his wife helped him with buttons because, while he could perform the task, it took him longer. (Def. L.R. 56.1 ¶ 29.)

Bouso testified that currently after he walks for an hour continuously, his right side gives up on him and he limps somewhat. (Def. L.R. 56.1 30.) He further testified that he is currently impaired because he cannot use his right side correctly, has a weakness in his right side, his left side is "cold," he struggles to speak, and his memory fails when he gets tired. (Pl. L.R. 56.1 ¶ 15.) He further testified that he has difficulty walking, seeing, breathing and learning new things, he can only stand for a limited amount of time and he has difficulty lifting. (Pl. L.R. 56.1 ¶¶ 18-22.)

### Reorganization of the Broadview Plant

In January 2002, Whittington, along with Steve Gardner ("Gardner"), Elkay's Human Resources Manager, implemented a reorganization of salaried staff due to budget constraints and forecasted business volume. (Def. L.R. 56.1 ¶ 38.) As part of this reorganization, Elkay was to eliminate both off-shift maintenance coordinators and reduce the HR staff by one individual. (Def. L.R. 56.1 ¶ 40.) In addition, the reorganization also called for the elimination of the Safety Coordinator. (Def. L.R. 56.1 ¶ 44.)

Fred Parks and Joe Ledoux were the two off-shift maintenance coordinators whose positions were eliminated. (Def. L.R. 56.1 ¶40.) The parties describe Parks only as "not disabled," while Ledoux is described as "Christian" and "not disabled." (Def. L.R. 56.1 ¶¶ 41-

42.) The individual who held the Safety Coordinator position, Chris Graves ("Graves"), had been with Elkay since 1997 and had been a manufacturing coordinator for two years before becoming the Safety Coordinator. (Def. L.R. 56.1 ¶ 45.) Therefore, Whittington and Gardner decided to transfer Graves back into the plant to become a standard manufacturing coordinator, and he would replace the standard manufacturing coordinator who had been with the company the shortest period of time. (Def. L.R. 56.1 ¶ 46.) According to Whittington and Gardner, Bouso was the standard manufacturing coordinator who had been with Elkay the shortest period of time, so Whittington and Gardner decided that Graves would take Bouso's position and Bouso's employment would be terminated unless he could find another position with the company. (Def. L.R. 56.1 ¶ 47.) When Bouso was notified of his termination, however, he told Whittington and Gardner that an African-American employee named "Norman" had less seniority but was not fired. (Pl. L.R. 56.1 ¶ 66.)

On March 23, 2002, the manufacturing coordinator in the Hydraulics Department resigned his employment in lieu of termination. (Def. L.R. 56.1 ¶ 56.) Elkay hired Mike Turner ("Turner") to replace him. (Def. L.R. 56.1 ¶ 60.) Turner had previously worked as a manufacturing coordinator in the Hydraulics Department during Bouso's employment but he quit his job because he could not take the pressure or the atmosphere and he had problems working with Kozel. (Def. L.R. 56.1 ¶ 59.) Bouso describes Turner as a "white, Christian not-disabled guy." (Pl. L.R. 56.1 ¶ 63.) Turner had less seniority with Elkay than Bouso. (Pl. L.R. 56.1 ¶ 81.)

7

## DISCUSSION

**A.     Title VII and § 1981 Claims[2]**

Bouso alleges discrimination based on his religion under Title VII. He also alleges discrimination based on national origin under both Title VII and § 1981. In his Complaint Bouso does not specify whether these claims relate to discriminatory termination or to a hostile work environment. However, because Bouso did not respond to Elkay's argument for summary judgment on any hostile work environment claim, the court assumes the claims are brought under a discriminatory termination theory. To the extent Bouso wished to allege any hostile work environment theory, the court views such a claim as undeveloped and therefore waived. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Bouso presents no direct evidence that his discharge was discriminatory, so his claim must be evaluated under the familiar *McDonnell Douglas* burden-shifting method. *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). To establish his *prima facie* case of discrimination, Bouso must show that "(1) he is a member of a protected class; (2) at the time of his discharge, he was meeting his employer's legitimate expectations; (3) he was discharged; and (4) his employer treated similarly situated individuals outside of the protected class more favorably." *Id.* If Bouso meets his *prima facie* proof, the burden of production then shifts to Elkay to articulate a legitimate nondiscriminatory reason for its action. *Id.* If Elkay

---

[2]The court analyzes the Title VII and § 1981 claims together because the same standards governing liability apply to each of the claims. *E.g., Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) ("The same standards governing liability under Title VII apply to section 1981.").

8

meets this burden, then Bouso must show that the reason set forth was not Elkay's true reason but instead was a pretext– "a dishonest explanation, a lie rather than an oddity or an error." *Id.* (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

Elkay does not dispute most of Bouso's *prima facie* proof, although, apparently challenging whether Bouso is a member of a protected class, it argues that none of the decision makers had knowledge of either Bouso's national origin or religion. In support of its argument, Elkay cites to cases requiring an employer to have knowledge of a disability to be liable under the ADA. *E.g., Hedberg v. Indiana Bell Tel.*, 47 F.3d 928, 933 (7th Cir. 1995) ("We think that an employer cannot be liable under the ADA for firing an employee when it undisputably had no knowledge of the disability."); *Pierce v. Martin*, No. 96 C 4046, 1997 WL 802104, at *4 (N.D. Ill. Dec. 30, 1997).[3] Elkay argues that the same logic applies here with respect to both Bouso's religion and national origin discrimination claims.

Starting with Bouso's national origin claim, the court disagrees that Elkay's apparent lack of knowledge that Bouso was Kurdish is determinative. In *Hedberg* the court distinguished an employer's knowledge of a disability from situations involving race or sex discrimination, where "the protected characteristic of the employee is immediately obvious to the employer. . . ." 47 F.3d at 932. Bouso's claim of national origin discrimination is closer to a claim for race or sex discrimination than to disability discrimination. While Elkay can perhaps argue that it was unaware that Bouso's national origin was actually Kurdish, it is highly improbable that Elkay

---

[3]Bouso's counsel incorrectly states that the court must ignore any citations to district court opinions because the Seventh Circuit prohibits such cases from being authority or precedent. While no doubt true that a district court opinion is not binding precedent, it can serve as persuasive authority. *E.g., United States v. Reed*, 272 F.3d 950, 955 (7th Cir. 2001). Indeed, the Seventh Circuit itself cites district court opinions (even unpublished ones) as persuasive authority. *E.g., Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (citing *Brown v. Village of Evergreen Park*, No. 02 C 0236, 2002 WL 31844991, at *4 (N.D. Ill. Dec. 18, 2002)).

9

was in the dark regarding Bouso's national origin. Like characteristics such as race or sex, by appearance alone Elkay would have had sufficient information to at least make presumptions about Bouso's national origin, which presumptions could have been the basis for any alleged discriminatory treatment. Therefore, the court rejects Elkay's argument on this ground.

Concerning the question of Bouso's religion, the court need not definitively address the issue of whether knowledge is required because Bouso has created at least a question of fact regarding whether Whittington was aware that Bouso was Muslim. Bouso testified that he once gave Whittington a gift of an "Egyptian goddess." Bouso claims that after receiving the gift Whittington stated that Bouso was "from that world" and "that means you are Muslim." (Bouso dep. at 180.) Whittington denies any knowledge of Bouso's religion, but on this motion the court must resolve all factual disputes in Bouso's favor. Bouso's testimony is enough to at least create a question of fact as to whether the decision makers at Elkay were aware that he was Muslim.

Moving past Bouso's *prima facie* case, Elkay maintains that it had a legitimate and nondiscriminatory reason for terminating Bouso. According to Elkay, as part of its reorganization, the Safety Coordinator position was to be eliminated and the incumbent in that position, Graves, was to transfer back to the position of a standard manufacturing coordinator replacing the person in that position who had been with the company the shortest period of time, who would then be terminated. Elkay submits that this was Bouso. As this is a legitimate nondiscriminatory reason for Bouso's termination, the court moves on to address the issue of pretext.

Bouso, through counsel, fails to mention much less present argument on the issue of pretext. Therefore, Elkay's legitimate and nondiscriminatory reason stands unrebutted. While

10

not specifically mentioning pretext, at one point Bouso avers that a black co-employee named "Norman" had less seniority and was not fired when Bouso was. However, as the undisputed evidence shows, as part of the reorganization the employee that would be terminated was that employee who had been with the company the shortest period of time. Elkay points out that "Norman" is in fact Norman Burtin, who had been with Elkay since September 18, 1996. Bouso was hired on September 11, 1999. While true that Bouso had been a standard manufacturing coordinator longer than Burtin, the fact remains that Elkay's legitimate nondiscriminatory reason was that because of reorganization the standard manufacturing coordinator employed with the company the shortest amount of time would be terminated, not the employee who was a standard manufacturing coordinator the shortest.

Moreover, Bouso does not mention the hiring of Turner to show pretext, and the court declines to construct the argument for him. *See Doherty* v. *City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) ("Given our adversary system of litigation, '[i]t is not the role of the court to research and construct legal arguments open to the parties, especially when they are represented by counsel.") (citation omitted). Even if such an argument were made, it would likely fail as Turner was hired into a position not eliminated in the reorganization but rather in the Hydraulics Department when another employee resigned. It is undisputed that Bouso never worked in the Hydraulics Department while Turner previously did. Thus, this argument would fail to show pretext. Accordingly, based on the above, summary judgment is appropriate in favor of Elkay on the national origin and religious discrimination termination claims.[4]

---

[4]Although not mentioned in his Complaint or EEOC charge, nor argued in his brief, Bouso does mention one set of facts which appear to be related to a claim of failure to accommodate his religious beliefs. According to
(continued...)

11

Finally, the court briefly addresses Bouso's argument that he was discriminated against because his photograph was not posted on Elkay's intranet site when he was hired. Initially, this act took place in January 1999 and would appear barred by the statute of limitations under Title VII requiring a charge of discrimination to be filed within 300 days of the alleged unlawful employment action. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).[5] However, even more fundamentally, Bouso cannot make out his *prima facie* case for this failure to post his picture because there was no adverse employment action taken. An adverse employment action is "a materially adverse change in the terms and conditions of employment [and] must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). Examples would include termination, demotion with a decrease in wage or salary, a less distinguished title, a material loss of benefits or significantly diminished responsibilities. *Id.* The failure to place Bouso's picture on the company's intranet system falls well short of any of these. Accordingly, judgment is entered in favor of Elkay on this claim also.

## B. ADA Discrimination

"The ADA forbids employers to discriminate against a 'qualified individual with a disability' because of the disability." *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 380 (7th Cir. 2003) (quoting 42 U.S.C. § 12112(a)). An employee may prevail under the ADA by presenting

---

[4](...continued)
Bouso, Kozel refused to allow even minimal time for his daily prayers. (Pl. L.R. 56.1 ¶ 64.) Bouso presents no argument or case law on such a failure to accommodate theory. Moreover, both his EEOC charge and Complaint do not list a failure to accommodate theory or facts which could reasonably support a theory that Elkay failed to accommodate Bouso's religion. Therefore, this claim is rejected.

[5]It would also be barred under the two year statute of limitations imposed in § 1981 cases. *E.g., Jones v. R.R. Donnelley & Sons Co.*, 305 F.3d 717, 728 (7th Cir. 2002).

either direct or indirect evidence of discrimination. *E.g., Pugh* v. *City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001). Bouso here relies on indirect evidence, so the court once again applies the *McDonnell Douglas* burden shifting method. *Id.*

Under this approach, Bouso must first establish his *prima facie* proof. To establish a *prima facie* case of discrimination under the ADA, Bouso must show that (1) he is disabled within the meaning of the ADA, (2) he is entitled to perform the essential functions of his job either with or without reasonable accommodation, and (3) he suffered an adverse employment decision because of the disability. *Id.* If Bouso establishes his *prima facie* proof, the burden shifts to Elkay to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* at 627. If Elkay meets its burden, Bouso must prove by a preponderance of the evidence that Elkay's reason is a pretext for discrimination. *Id.*

Starting with the issue of disability, which is the threshold of Bouso's *prima facie* case, a disability under the ADA is defined as either:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2); *Sutton* v. *United Air Lines,* 527 U.S. 471, 478 (1999). A major life activity is an activity of central importance to daily life. *Toyota Motor Mfg. Kentucky, Inc.* v. *Williams,* 534 U.S. 184, 197 (2002). ADA regulations provide the following representative list of major life activities: caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working. 29 C.F.R. § 16030.2(i). A substantial limitation is defined under the ADA regulations as

13

> Unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(i).

Bouso argues that his stroke constitutes a major life activity for which he is substantially limited. While a stroke could certainly constitute an impairment, and Bouso does allege that certain major life activities were limited (including his ability to walk, speak and breathe), his evidence falls far short of establishing a substantial limitation on any of these major life activities. Bouso himself presents no medical testimony reflecting that he suffers from substantial limitations on these major life activities. Moreover, Bouso's own statements fail to create an issue of fact to show a substantial limitation. For example, Bouso stated only that he "struggles" to talk, but does not clarify how such struggling substantially affects his ability to talk when compared to the condition, manner or duration under which an average person can talk. His claim that he has trouble remembering when he is tired suffers from the same flaw. In addition, his testimony that when he walks for an hour his right side "gives up on him" and that he limps "somewhat" is insufficient. The same for his conclusional statements without factual support that his "breathing" is restricted or that he cannot lift objects. None of this creates a triable issue of fact that Bouso was substantially limited in these activities as compared to the average person in the general population.

To the extent that Bouso claims that he was substantially limited in his ability to work, his claim fails for the independent reason that he has not put forth any evidence that he was "significantly [restricted in] the ability to perform a class of jobs or a broad range of jobs in

14

various classes." *Webb* v. *Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 998 (7th Cir. 2000) (bracket in original) (citing *Weiler* v. *Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir. 1996)). Because Bouso fails to present sufficient evidence to establish that he is disabled within the meaning of the ADA, his claim for ADA discrimination fails. Accordingly, summary judgment is granted in favor of Elkay on this claim.

C.  **Retaliation**

Bouso claims that he was retaliated against for complaining about Kozel's discriminatory conduct. It is undisputed that the only person Bouso complained to specifically about this discriminatory conduct was Kozel himself.[6] Elkay maintains that Bouso's retaliation claim must fail because it was not raised in his EEOC charge. Bouso admits that his retaliation claim was not included in his EEOC charge but submits that it is "like or reasonably related" to his claims of discrimination.

The "like or reasonably related" exception provides that the court may hear claims brought in a complaint but not raised in an EEOC charge if both "(1) the claim is like or reasonably related to the EEOC charges, and (2) the claim in the complaint could reasonably develop from the EEOC investigation into the original charges." *Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995). Bouso's claim that he was retaliated against fails at part (1) of the test. Bouso's charge that he was terminated because of his national origin, religion and disability does not suggest that he was retaliated against after exercising protected rights. *Cf. Noreuil* v. *Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996) ("In general, we have held that retaliation and age discrimination claims are

---

[6]As was discussed in the fact statement above, Bouso did speak with Whittington but did not mention any discrimination. Instead, he asked to be transferred to another department because Kozel was putting too much pressure on him and because of his health. (Def. L.R. 56.1 ¶ 35.)

15

sufficiently dissimilar that an administrative charge of one fails to support a subsequent civil suit for the other."); *see also Nair* v. *Bank of Am., Ill.*, 991 F. Supp. 940, 954 (N.D. Ill. 1997) (dismissing race and national origin claim because the plaintiff charged unlawful retaliation in his EEOC charge and the EEOC charge "contains no factual allegations from which a charge of race or national origin discrimination may be inferred."). Although a plaintiff may be excused from filing an EEOC charge of retaliation where the alleged retaliation stems from actions a defendant took because a plaintiff previously filed the EEOC charge at issue in the law suit, *see, e.g.*, *Heuer* v. *Weil-McLain*, 203 F.3d 1021, 1023 (7th Cir. 2000), there is no basis to support this theory here, as Bouso did not file his EEOC charge until after he was terminated and does not allege that he was retaliated against after his termination. Because Bouso did not raise his retaliation claim in his EEOC charge and because no facts are listed in the charge that could support such a theory, Bouso's retaliation claim must fail.

## CONCLUSION

For the reasons stated above, Elkay's motion for summary judgment is granted [#13]. The clerk is instructed to enter judgment in favor of the defendant. All future dates, including the January 26, 2004, trial date, are stricken. This case is terminated.

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: October 22, 2003